STATE of Delaware

v.

Lewis HUNTLEY, Eulus Martins, Joanna Miller.

Nos. 9810003443, 9810003434 and 9810003441.

Superior Court of Delaware.

Submitted: Feb. 18, 2000.
Decided: May 23, 2000.

Maria T. Knoll, of the Department of Justice, Wilmington, DE, for the State.

Thomas A. Foley, Wilmington, DE, for Defendant Lewis Huntley.

Andrew J. Witherell, Wilmington, DE, for Defendant Eulus Martins.

James Folsom, Wilmington, DE, for Defendant Joanna Miller.

## OPINION

BABIARZ, Judge.

Defendants were pulled over for speeding on Interstate 95 by two Delaware State Police troopers. Based on their responses and demeanor, the defendants were detained and questioned by the police. Lewis Huntley, one of the passengers and the owner of the vehicle, gave the police written consent to search the minivan, after twice refusing the troopers' request for consent. A roadside search of the vehicle revealed cocaine and marijuana. Defendants move to suppress any evidence uncovered in the search as well as any statements made to the police in connection with the search, contending that the search was in violation of their rights under the Fourth Amendment of the United States Constitution, and Article I, Section 6 of the Delaware Constitution of 1897. Because the Court finds that the troopers lacked reasonable suspicion to support a prolonged detention of the defendants, and that Mr. Huntley's consent was tainted by the illegal detention, the motion to suppress is **GRANTED**.

## I. FACTS

On October 5th, 1998, at 6:10 p.m., Sergeant Engler and Trooper First Class Kreisman of the Delaware State Police were driving southbound on I-95 in an unmarked police car. The speed limit in that area is 55 miles per hour. Sergeant Engler and Trooper Kreisman are assigned to the Special Investigation Unit, whose primary purposes are to conduct routine traffic stops and to detect and apprehend persons involved in interstate criminal activity.

That evening three different vehicles caught the officers' attention. The first vehicle was a silver colored car which sped past the troopers, and then immediately slowed down. The second vehicle was a black Nissan Sentra which also passed the officers' vehicle but then slowed down. The third vehicle was defendant Lewis Huntley's Mazda minivan, which passed the troopers at about 70 to 71 miles per hour without slowing down. In accordance with their standard procedure, the officers began to pace the defendant's minivan. Sergeant Engler then noticed that the black Nissan Sentra was tailgating his car, and appeared prone to strike the troopers' vehicle. Sergeant Engler pumped his brakes and activated the vehicle's rear emergency lights, at which time the Nissan slowed down and veered off to the right.

While still pacing the minivan, Sergeant Engler turned on his emergency lights, and the minivan properly pulled over to the left shoulder of I-95. Sergeant Engler approached the driver of the minivan, defendant Eulus Martins, and asked him for his license, registration, and proof of insurance. Mr. Martins produced these documents. Sergeant Engler then asked Mr.

Martins to exit the vehicle and walk to the rear side. After informing Mr. Martins that he was stopped for speeding, Sergeant Engler questioned Mr. Martins about where he was coming from and where was he going to. Mr. Martins responded that he had been in New York visiting friends along with Mr. Huntley, the owner of the minivan, and that they were returning home to Maryland. Sergeant Engler testified that Mr. Martins' answers seemed truthful, but "fuzzy." Mr. Martins told Sergeant Engler that the minivan had been traveling in tandem with an acquaintance who drove a black Nissan. Out of concern for the officers' safety, Sergeant Engler instructed Trooper Kreisman to call for back-up units. Sergeant Engler retained Mr. Martins' license, along with the minivan's registration and insurance.

Sergeant Engler next ordered Mr. Huntley to exit the minivan, and he asked Mr. Huntley where he had been and where he was going. Mr. Huntley said that they had spent the day in Atlantic City, New Jersey, and that they were returning to Maryland. Mr. Huntley gave Sergeant Engler his Maryland driver's license. Because of the inconsistent stories given by Mr. Huntley and Mr. Martins, Sergeant Engler questioned Mr. Martins again, who repeated that they had been in New York City. Sergeant Engler then spoke to Mr. Huntley a second time, who again told the trooper that they had spent the day in Atlantic City.

Sergeant Engler then interrogated the third passenger, defendant Joanna Miller, about her itinerary. She pointed to Mr. Huntley and responded: "What the other guy said." Sergeant Engler questioned her further, and she said that she had been in Atlantic City. At Sergeant Engler's request, she provided her Maryland driver's license to him.

At about 6:25 p.m., Sergeant Engler returned to Mr. Huntley, whom the trooper said seemed nervous, avoided eye contact, rocked from side-to-side, and appeared dry-mouthed. Sergeant Engler asked Mr. Huntley if he was armed, and performed a pat-down search on Mr. Huntley, which yielded nothing. At this point, Sergeant Engler had in his possession each of the defendants' driver's licenses, along with the minivan's registration and proof of insurance.

Sergeant Engler asked Mr. Huntley if there were any weapons or contraband in the minivan, including drugs, alcohol, or untaxed tobacco. Mr. Huntley said that there were no such items in the vehicle. Sergeant Engler then asked Mr. Huntley for permission to search the vehicle. Sergeant Engler's stated reason for the search request was that because of the conflicting stories and Mr. Huntley's apparent nervousness, there was a "potential for criminal activity." Mr. Huntley refused to give consent to search. Sergeant Engler told Mr. Huntley that the search would take about twenty minutes, provided nothing was found and there were no outstanding warrants on any of the defendants. Mr. Huntley again refused Sergeant Engler's request to search the minivan.

The defendants were each told that they could not leave, and they were ordered to sit along the highway. Two additional State Troopers arrived on the scene. Sergeant Engler instructed Trooper Kreisman to radio for a drug-sniffing K–9 dog. Sergeant Engler testified that he may have locked the minivan and taken the keys. It was now about 6:30 p.m., twenty minutes after the initial stop.

Several minutes later, Mr. Huntley asked Sergeant Engler how much longer they would have to wait. Sergeant Engler told him the detention would take any-

where from twenty minutes to three hours, depending upon whether or not the K–9 dog reacted to a sniff of the minivan. Sergeant Engler then returned to his car.

Shortly afterwards, Mr. Huntley again approached Sergeant Engler, and gave him permission to search the minivan. Mr. Huntley signed a "Delaware State Police Consent to Search" form at about 6:38 p.m., with Ms. Miller and Mr. Martin signing as witnesses.

Sergeant Engler and Trooper Kreisman began a search of the minivan. In the rear of the minivan, Sergeant Engler saw and felt a portion of a bag located in a right-side quarter panel, above and behind the windshield-washer fluid reservoir. Both troopers suspected that the bag contained drugs, and they decided to have the minivan towed to Delaware State Police Troop 9, where a thorough search could be conducted. All three defendants were handcuffed, placed under arrest, and transported to Troop 9.

At Troop 9, the police tore apart the rear portion of the passenger compartment to obtain access to the right-side quarter panel. Inside the panel, they found three packages containing cocaine and marijuana. No search warrant was obtained.

The defendants were then formally arrested and each provided statements. Mr.

Martins was given a citation for speeding, about two hours after the initial stop.

## II. STANDARD

■■■■ On a motion to suppress, the Defendant bears the burden of establishing that the challenged search or seizure violated his Fourth Amendment rights.[1] The Defendant must prove by a preponderance of the evidence that he is entitled to relief.[2]

## III. DISCUSSION

■■■■ Defendants move to suppress all physical evidence and statements obtained by the State as a result of the roadside detention and subsequent search.[3] They assert that the police had no reasonable suspicion of illegal activity upon which to base a prolonged detention beyond the time necessary for the issuance of a traffic citation, and that Mr. Huntley's consent to search the minivan was invalid because it was the fruit of an unlawful seizure. The State contends that the detention was lawful based on the troopers' reasonable suspicion of criminal activity, and that Mr. Huntley's consent to search was voluntary.

This case presents two issues: First, the Court must determine the reasonableness of the detention in order to determine whether the Defendants were seized in violation of the Fourth Amendment to the

1. *State v. Thomason,* Del.Super., Cr.A. No. IN9207–0022–0025, 1994 WL 637294, Goldstein, J. (1994) (Mem.Op.) (citing *Rakas v. Illinois,* 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)).

2. *State v. Bien–Aime and Smalls,* Del.Super., Cr.A. No. IK92–08–0326, 1993 WL 138719, Toliver, J., (1993) (Mem.Op.) (citing *United States v. Casteneda,* 5th Cir., 951 F.2d 44 (1992)).

3. The State contends that Defendant Miller lacks the right to contest the legality of the search. The Court finds Ms. Miller does have

standing to challenge her detention. *See United States v. Fuentes,* 10th Cir., 182 F.3d 933, 1999 WL 311481, at *3 (1999) (holding that driver had no privacy interest in a borrowed car to contest a search, but had standing to challenge his detention and evidence found as a result thereof); *Jarvis v. State,* Del.Supr., 600 A.2d 38, 41 n. 1 (1991) (finding that passenger had standing to object to the circumstances under which her person was seized where she was detained as result of the stop, even though she did not own the vehicle, exercise any control over it, or have any reasonable expectation of privacy in it).

United States Constitution.[4] Second, the Court will address the validity of Mr. Huntley's consent to search his vehicle.

## A. REASONABLENESS OF THE DETENTION

### Initial Stop

■ A person is considered "seized" under the Fourth Amendment when, in view of all of the circumstances surrounding the incident, a reasonable person would not feel free to leave.[5] The authority and limits of the Fourth Amendment apply to investigative traffic stops of vehicles.[6] The temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a "seizure" of "persons" within the meaning of the Fourth Amendment.[7] However, ordinarily a traffic stop involving a motorist does not initially violate the federal Constitution if the police have probable cause to believe that the driver has committed a traffic violation.[8]

■ It is undisputed that the initial stop of the minivan by Sergeant Engler for speeding constituted a seizure of the defendants for Fourth Amendment purposes, but that such a seizure was supported by the probable cause possessed by the troopers having witnessed Mr. Martins' traffic violation. Indeed, the defendants do not contest the initial stop. Additionally, the defendants concede that Sergeant Engler was permitted to order the driver and the passengers out of the minivan and briefly detain them in connection with the issuance of a traffic citation,[9] but they argue that there was no reasonable suspicion to permit additional detention.

### Further Detention And Questioning

■ If a person is lawfully stopped for a traffic violation, the officer may detain the individual only as long as necessary to effectuate the purpose of the stop.[10] If during such a stop the officer further detains the person in order to investigate other possible crimes, the officer must have a reasonable articulable suspicion that additional criminal activity is afoot.[11] "Reasonable suspicion" is more than an ill-defined hunch; rather, under

4. The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides for "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

5. *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988) (*citing United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *State v. Morris*, Del.Super., Cr.A. No. 9610010230, 1997 WL 363938, Goldstein, J., (1997) (Op. and Order)).

6. *United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).

7. *Whren v. United States*, 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). *See also*

*State v. Fitzpatrick*, Del.Super., Cr.A. No. IN93–08–1593, 1994 WL 380992, Carpenter, J., (1994) (Mem.Op.).

8. *Whren* at 810, 116 S.Ct. 1769; *Prouse* at 659, 99 S.Ct. 1391.

9. *See Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (holding that police may order the driver to exit a lawfully stopped vehicle); *Maryland v. Wilson*, 519 U.S. 408, 415, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) (extending *Mimms* and holding that police may order passengers to get out of the car pending completion of a traffic stop).

10. *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

11. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

the totality of the circumstances—the whole picture—the detaining officer must have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." [12] It requires the police officer to point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the investigatory stop.[13] The detention must be "reasonably related in scope to the circumstances which justified the interference in the first place." [14] In making this assessment, the Court must judge the facts under an objective standard: "would the facts available to the officer at the moment of the seizure ... 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" [15]

In clarifying the nature of an investigative detention based on reasonable suspicion, the Supreme Court stated: "[T]he officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's an-

swers provide the officer with probable cause to arrest him, he must then be released." [16]

Delaware has adopted a statute which authorizes brief detention for identification purposes of a person who is "abroad" or in a public place when the police officer "has reasonable ground to suspect [that the person] is committing, has committed or is about to commit a crime....".[17] As the language of the statute indicates, a detention must be supported by reasonable suspicion, and where there is no reasonable basis to suspect the detainee has committed a crime, any detention of that defendant is unlawful.[18]

■ The defendants contend that the troopers possessed no reasonable suspicion to support further detention and questioning beyond the limited time necessary to investigate the speeding violation. The State points to the defendants' driving in tandem with another vehicle, the defendants' conflicting accounts of what city they came from, and Mr. Huntley's nervousness during questioning as factors

12. *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *Robertson v. State*, Del.Supr., 596 A.2d 1345, 1350 (1991); *Houston v. Clark County*, 174 F.3d 809, 813 (6th Cir.1999).

13. *Terry* at 21, 88 S.Ct. 1868; *Downs v. State*, Del.Supr., 570 A.2d 1142, 1145 (1990); *State v. Brown*, Del.Super., Cr.A. No. 9710011034, Terry, J., (July 27, 1998) (Mem.Op.).

14. *Terry* at 20, 88 S.Ct. 1868; *Robertson* at 1352.

15. *Terry* at 21, 88 S.Ct. 1868; *State v. Morris*, Del.Super., Cr.A. No. 9610010230, 1997 WL 363938 Goldstein, J. (1997) (Op. and Order).

16. *Berkemer v. McCarty*, 468 U.S. 420, 439–440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

17. Delaware's Two–Hour Detention Law states, in pertinent part, as follows:

(a) A peace officer may stop any person abroad, or in a public place, who the officer has reasonable ground to suspect is committing, has committed or is about to commit a crime, and may demand the person's name, address, business abroad and destination.
(b) Any person so questioned who fails to give identification or explain the person's actions to the satisfaction of the officer may be detained and further questioned and investigated.
(c) The total period of detention provided for by this section shall not exceed two hours.... At the end of the detention the person so detained shall be released or be arrested and charged with a crime. 11 *Del.C.* § 1902.

18. *Hicks v. State*, Del.Supr., 631 A.2d 6, 9 (1993) (*citing State v. Wrightson*, Del.Supr., 391 A.2d 227, 229 (1978)).

that, under the totality of the circumstances, gave the police reasonable articulable suspicion to detain the defendants in connection with criminal activity. The Court disagrees.

The majority of courts that have cited tandem driving, conflicting stories, and/or general nervousness as factors supporting a finding of reasonable suspicion have done so only in conjunction with other more tangible, objectively articulable indicators of criminality, such as driving with a suspended license, failure to provide proof of

ownership of the vehicle, or the palpable odor of alcohol, drugs, or air freshener (often used to mask the smell of marijuana and cocaine).[19] By contrast, courts that have found reasonable suspicion based primarily on some of the factors present in this case are in the minority.[20] This Court agrees with the majority view.

When requested by Sergeant Engler, the defendants produced driver's licenses and the minivan's proof of insurance and registration. All documentation was apparently in order.[21] There is no indication

**19.** *See United States v. Sharpe,* 470 U.S. 675, 682 n. 3, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (finding reasonable suspicion where police observed heavily-loaded truck with camper shell commonly used to transport drugs was traveling in tandem with another car, near drug area, and taking evasive action); *United States v. Martinez,* 8th Cir., 168 F.3d 1043, 1047 (1999) (nervousness, inconsistent answers, incomplete bill of sale presented as registration, and license check showing criminal history); *United States v. Hunnicutt,* 10th Cir., 135 F.3d 1345, 1350(1998) (suspended license, no insurance nor proof of authority to use car, nervous behavior and inconsistent responses) *Mohmed v. State,* Tex.App. 977 S.W.2d 624, 628 (1998) (nervousness and odor of drugs); *Fields v. State,* Tex.App., 932 S.W.2d 97, 105 (1996) (inconsistent stories, extreme nervousness, suspended license, and passenger's denial of history of drug offenses); *United States v. Finke,* 7th Cir., 85 F.3d 1275, 1282 n. 4 (1996) (prior narcotics convictions, use of a rental car, and nervousness); *United States v. Palomino,* 6th Cir., 100 F.3d 446, 450 (1996) (inconsistent stories about the ownership of the car and the purpose of the trip, nervousness, driver's criminal record, and the odor of chemicals associated with cocaine); *State v. Dickey,* N.J.Super., 294 N.J.Super. 619, 684 A.2d 92, 95 (1996) (inconsistent stories, extreme nervousness, bloodshot eyes, lack of registration, and volunteered references to there being nothing in the trunk); *United States v. Hernandez,* D.Del., 872 F.Supp. 1288, 1294 (1994) (air freshener, nervousness, inability to answer routine questions about line-of-business and car owner); *United States v. Bloomfield,* 8th Cir., 40 F.3d 910, 915 (1994)

(perspiration, evasive responses, possession of a pager, and odor of a masking agent); *United States v. Shabazz,* 5th Cir., 993 F.2d 431, 433 (1993) (false identification and inconsistent stories); *United States v. Turner,* 10th Cir., 928 F.2d 956, 959 (1991) (nervousness and no registration); *United States v. Cummins,* 8th Cir., 920 F.2d 498, 502 (1990) (counter-surveillance driving to avoid police, nervous and evasive behavior, and inconsistent answers); *United States v. Walraven,* 10th Cir., 892 F.2d 972, 975–76 (1989) (suspicious actions, nervousness, and failure to promptly yield to flashing police lights).

**20.** The Court's research discloses no cases that have found reasonable suspicion based solely on the three factors present in this case. *See United States v. Kopp,* 10th Cir., 45 F.3d 1450, 1453–54 (1995) (reasonable suspicion based on explanation of driving a dilapidated sofa from California to friends in North Carolina, inconsistent stories, and nervousness); *United States v. Johnson,* 8th Cir., 58 F.3d 356, 358 (1995) (detention upheld based on inconsistent stories, followed immediately by consent to search); *United States v. Springer,* 2nd Cir., 946 F.2d 1012, 1017 (1991) (reasonable suspicion from contradictory responses and defendant's implausible denial of ownership of a suitcase he was carrying); *United States v. Hardy,* 11th Cir., 855 F.2d 753, 758 (1988) (reasonable suspicion based on conflicting stories and the fact that passenger and driver, asserted "friends," did not know each others last names or other basic information).

**21.** There is no evidence in the record that the police ran computer checks on the minivan's documentation or the defendants' licenses.

that there were outstanding warrants for any of the defendants, or that the car had been stolen or improperly registered. The pat down search of Mr. Huntley revealed neither a weapon nor contraband. There was nothing to indicate that the defendants were in any way engaged in the transportation of illegal drugs. The continued detention of the defendants Was based solely upon the trooper's conclusion the defendants' appearance, responses, and traveling habits meant that they were criminals.

In considering the "whole picture" painted by the facts in this case, the Court believes that a person of reasonable caution would not be warranted in believing that tandem driving, a nervous demeanor, and conflicting stories reasonably indicates that the defendants had committed a crime. The State simply cannot show that the troopers' detention of the defendants was based on suspicions of criminality that were reasonably articulated or objectively justified by the facts.[22] As such, the seizure was unlawful, and the troopers were obliged to release the defendants from detention after the completion of a license and vehicle check and the issuance of a traffic citation.

**22.** See *U.S. v. Dortch*, 5th Cir., 199 F.3rd 193 (1999) (inconsistent statements did not give rise to reasonable suspicion); *Graham v. State*, Md.Ct.Sp.App., 119 Md.App. 444, 705 A.2d 82, 94 (1998) (finding no reasonable suspicion based on inconsistent itineraries to support continued detention for canine sniff after license check was completed); *Whitehead v. State*, Md.Ct.Sp.App., 116 Md.App. 497, 698 A.2d 1115, 1119 (1997) (finding no reasonable suspicion based on inconsistent stories and nervousness); *Davis v. State*, Tex. Crim.App., 947 S.W.2d 240 (1997) (same); *People v. Banks*, N.Y.Ct.App., 85 N.Y.2d 558, 626 N.Y.S.2d 986, 650 N.E.2d 833, 835 (1995) (same); *People v. Milaski*, N.Y.Ct.App., 62 N.Y.2d 147, 476 N.Y.S.2d 104, 464 N.E.2d 472, 476 (1984) (same).

## B. CONSENT TO SEARCH

Because the troopers did not have reasonable suspicion to believe that the defendants were engaged in criminal activity prior to detaining them, the next issue is whether the subsequent consensual search was tainted by the illegal detention.

It is well settled that a search conducted pursuant to a valid consent is an exception to the requirements of a warrant and probable cause.[23] In order for consent to be constitutionally valid, the consent to search must be voluntary, which is a question of fact to be determined from the totality of the circumstances.[24]

However, consent that is given by a person who is being illegally detained is tainted by the illegality and is thus ineffective to justify the search.[25] Consequently, all evidence obtained as a result of the search must be suppressed as fruit of the unlawful detention unless the consent has been purged of the taint of the illegal seizure.[26] Under the facts of this case and considering the totality of the circumstances, the seizure of the defendants was unlawful. The consent to search was given

**23.** *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *State v. Morris*, Del.Super., Cr.A. No. 9610010230, 1997 WL 363938, Goldstein, J., (1997) (Op. and Order).

**24.** *Bustamonte*, 412 U.S. at 227, 93 S.Ct. 2041.

**25.** *State v. Morris*, Del.Super., Cr.A. No. 9610010230, 1997 WL 363938, Goldstein, J., (1997) (Op. and Order); *State v. Wrightson*, Del.Super., 391 A.2d 227, 228 (1978); See also *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

**26.** *Wrightson* at 229 (citing *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963))

shortly after the illegal seizure and there are no intervening circumstances here that would dispel the taint of the poisonous tree.[27] Therefore, the drugs and incriminating statements obtained as a result of the illegal detention and search of Mr. Huntley's minivan must be suppressed.

## IV. CONCLUSION

For the reasons stated herein, the Defendants' Motion to Suppress is *GRANTED.*

27. The fact that the defendants were locked out of their minivan, unable to leave, not in possession of their identification and vehicle information, informed that a canine sniff might take three hours, and that they were not told they could refuse to consent further vitiates against finding that the consent was voluntary, non-coerced, and purged of the taint of the illegal seizure.